UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

MAR 1 7 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| CASTLE HILLS FIRST BAPTIST,<br>CHURCH,<br>　　　　　　Plaintiff, | §<br>§<br>§<br>§ | |
| v. | § | No. SA-01-CA-1149-RF |
| | § | |
| CITY OF CASTLE HILLS,<br>　　　　　　Defendant. | §<br>§ | |

## ORDER

BEFORE THE COURT are Plaintiff's Motion for Summary Judgment (Docket No. 48), Defendant's Motions for Partial Summary Judgment (Docket Nos. 52, 56, 104), Intervenor State of Texas' Motion for Summary Judgment (Docket No. 50), and various responses, replies, and supplemental and amicus briefs. A hearing was held on the matter on October 22, 2003. After careful consideration of the briefs and the oral arguments, the Court is of the opinion that Plaintiff's Motion for Summary Judgment (Docket No. 48) should be GRANTED IN PART and DENIED IN PART and that Defendant's Motions for Partial Summary Judgment and Summary Judgment (Docket Nos. 52, 56, 104) should be GRANTED IN PART, DENIED IN PART and DISMISSED WITHOUT PREJUDICE IN PART for the reasons explained herein.

The crux of the instant controversy is the balance of zoning with religious freedom and, therefore, the fulcrum of Plaintiff's case is alleged violations of religious freedom protections. Although Plaintiff states other claims, and both parties move, albeit awkwardly,

124.

for summary judgment on those additional, non-religion based claims,[1] the Court finds that the record on those points is not sufficiently developed. Neither party has sufficiently addressed the claims grounded outside of religious freedom guarantees, nor did the hearing on the Motions for Summary Judgment reflect that either party placed importance at that time on those issues. Moreover, this cause survived a protracted pretrial phase and disposition, as the case was transferred several times prior to this consideration. Therefore, as detailed herein, the Court will dispose of the claims grounded in federal protections of religious freedom and dismiss the dispositive motions as to the remaining claims without prejudice, subject to refiling by either party. Should the parties agree that the religious freedom issues form the substance of the cause and thus that this order disposes of the dispute, even if not content with the result, then the case shall be closed in its entirety.

In light of the heft accorded to the federal claims in both the briefing and oral arguments, the Court finds the current record an insufficient basis for the interpretation of Texas law. Moreover, in *Tilton v. Marshall*, the Texas Supreme Court specifically indicated its desire to review complete briefing on the free exercise provision of the Texas Constitution, including among other things, the historical context and framers' intent, prior to addressing the differences between the Texas free exercise provision and the federal

---

[1] Both Plaintiff's and Defendant's dispositive motions are deceptively titled. Plaintiff filed its Motion for Summary Judgment, but then states that it seeks only partial summary judgment on specifically delineated issues of law, related to only some of the causes of action. Defendant filed both a Motion for Partial Summary Judgment and a Supplemental Motion for Summary Judgment, but then clarifies that it seeks the entry of judgment in its favor on each and all of Plaintiff's claims. It appears that, despite titles, Plaintiff attempted to narrow the issues for the parties and the Court and the Defendant attempted to dispose of all of Plaintiff's claims. The record is not currently suited for a disposition of all claims.

parallel.[2]  In light of the Texas Supreme Court's directive in *Tilton*, the Court declines to

exercise supplemental jurisdiction over the state law claims.  Therefore, those claims will be

dismissed without prejudice, subject to refiling in state court.  For purposes of consistency,

judicial economy, and for the integrity of Plaintiff's case, the Court will similarly dismiss all

state claims subject to refiling.  In the event that Plaintiff chooses to refile in state court,

these claims heard together may more accurately reflect the whole of the matter and the

whole of state law issues implicated.

## PROCEDURAL BACKGROUND

Plaintiff Castle Hills First Baptist Church ("the Church" or "First Baptist") filed suit

against Defendant City of Castle Hills ("the City") on December 14, 2001, challenging the

City's denial of special use permits to the Church.  Specifically, the Church complained that

the City failed to grant a special use permit ("SUP") for the construction of an additional

parking lot and refused to consider the Church's SUP application for a changed use of the

top story of a Church building, both in alleged violation of the Church's federal and state

rights to free exercise of religion.  The Church grounds these claims on the Religious Land

Use and Institutionalized Persons Act of 2000 (RLUIPA),[3] the United States Constitution,

the Texas Religious Freedom Restoration Act (Texas RFRA),[4] and the Texas Constitution.

---

[2]  925 S.W.2d 672, 677 n.6 (Tex. 1996)

[3]  42 U.S.C. § 2000cc *et seq* (2003).

[4]  TEX. CIV. PRAC. & REM. CODE § 110.003 *et seq*. (Vernon's Supp. 2004).

Plaintiff's Third Amended Complaint states fourteen causes of action.[5] They are: (I) violation of the U.S. Constitution's guarantee of free exercise of religion;[6] (II) violation of the Texas Constitution's guarantee of religious freedom; (III) violation of the U.S. Constitution's guarantee of free speech; (IV) violation of the Texas Constitution's guarantee of free speech; (V) violation of the U.S. Constitution's guarantee of free association; (VI) violation of the U.S. Constitution's guarantee of equal protection; (VII) violation of the Texas Constitution's guarantee of equal protection; (VIII) violation of the U.S. Constitution's guarantee of due process; (IX) violation of the U.S. and Texas Constitutions' guarantees against takings without just compensation; (X) violation of RLUIPA for discrimination on the basis of religion; (XI) violation of RLUIPA for a substantial burden on religious exercise; (XII) violation of RLUIPA for limitations on religious assemblies; (XIII) violation of Texas RFRA; (XIV) abuse of municipal discretion.[7]

Plaintiff Church moves for summary judgment, claiming that as a matter of law the City substantially burdened the Church's religious exercise, in both its denial of the SUP for additional parking and its denial of the SUP for occupied use of an existing fourth floor

---

[5] For purposes of an ultimate entry of judgment, the Court uses the numbers that follow – as assigned by the Court – to identify Plaintiff's claims.

[6] Each of Plaintiff's claims of violation of the United States Constitution arise under 42 U.S.C. § 1983.

[7] In this opinion, the Court disposes only of the claims related to federal religious freedom, that is claims grounded on RLUIPA and the free exercise clause of the First Amendment. The remaining federal law claims (III, V, VI, VIII, and IX) survive summary judgment at this point only by order of the Court, and either party may file a dispositive motion addressing the remaining claims, as directed herein.

space.  The Church claims on several grounds that strict scrutiny is the proper standard of review for discretionary land use regulations that substantially burden religious exercise. Finally, the Church argues that the City cannot meet its burden because its interest was not a compelling governmental interest and denial of each permit was not narrowly tailored.[8] Therefore, the Church seeks summary judgment on five claims: (1) the permit denial regarding the parking lot substantially burdened religious exercise; (2) the permit denial regarding the fourth floor use substantially burdened religious exercise; (3) strict scrutiny is the proper standard of review for discretionary land use regulations that discriminate against or substantially burden religious exercise; (4) the City's asserted interests fall short of compelling governmental interests; and (5) the denial of a permit is not the least restrictive means to promote the City's interest if the special use permit process will adequately address the City's interests.

Defendant City moves for partial summary judgment, asking the Court to dismiss the majority of the Church's claims as a matter of law.  The City claims that its conduct related to the Church's SUP applications is subject to rational basis review, and is not contemplated by either the RLUIPA or the protections afforded by the First Amendment.  The City also argues that its protection of a city is a compelling interest, and that enforcement of a prior SUP is neither a denial of a right nor a regulation.  The City challenges the constitutionality

---

[8] By the Church's own admission, its motion for summary judgment is actually a motion for partial summary judgment.  "The Church also claims that this and other asserted 'governmental interests' are, as a matter of fact, pretextual, but does not seek summary determination of these claims at this time."  Plf.'s Mot. Summ. J., at 3 n.2.

of both RLUIPA and the Texas RFRA in so far as they attempt to encompass parking regulations. The United States intervenes to support the constitutionality of RLUIPA, and the State of Texas intervenes to file a cross-motion for summary judgment, supporting the Texas RFRA's constitutionality.

## THE UNDISPUTED FACTS

The Church is a non-profit Texas corporation and a Christian ministry, located in Castle Hills, Texas and serving the larger San Antonio community. The Church has existed in its current location on Northwest Military Highway since 1953, but only a minority of the Church's congregation lives within the Castle Hills city limits. The current Church complex of 25 acres comprises several buildings and parking lots, adjacent to a low density, residential neighborhood of approximately 100 homes.

The City is a Type "A" general law city, border confined within the city of San Antonio, Texas. The population of Castle Hills is approximately 4,202 and the approximate number of family households is 1,219. The amount of land in Castle Hills is approximately 2.48 sq. miles.[9] As described by an expert hired by the City, Castle Hills "is largely a single-family-home community with a few churches and some commercialization along the major arterials."[10] Castle Hills has seen substantial growth in recent history. Across the street from the Church, across Northwest Military Highway, are several large shopping centers, which

---

[9] *See* 2000 U.S. Census Data from the U.S. Census Bureau for Place: Castle Hills, Texas, at http://censtats.census.gov/data/TX (last viewed on Mar. 12, 2004).

[10] App. to Plf's Mot. for Summ. J., Ex. 52; Depo. of David Pugh, at 49:5-7.

had previously been residential homes.[11]  Also, in the past several years, the major arterial, Northwest Military Highway, was expanded and is now a wide and heavily traveled thoroughfare.  In addition to commercial growth, Castle Hills became home to several churches other than Castle Hills First Baptist, at least one of which is both a church and primary school, like First Baptist.

The entire First Baptist Church complex is built within an area zoned "A," Single Family Dwellings.[12]  A church or place of worship is a permissible activity in every zone established by Castle Hills City Ordinances, except Zone "AA,"[13] therefore the Church at issue is permissibly located in Zone "A."  The Church's desired uses for the land, however, have required a special use permit.[14]  Most recently, the Church sought by way of a special use permit application to expand its premises and facilities with the addition of a supplemental parking lot and the occupied use of the upper story in an existing building.  The City opposed the proposed expansion.

---

[11]  Plf.'s Mot. Summ. J., Ex. 43; Depo. of Dorothy Harle, at 28.  The homes located where the shopping centers now stand were demolished without permission of the City because at the time there was no requirement for permitting prior to demolition.  *Id.*

[12]  D's Mot. for Summ. J., Ex. 16 & 22. *See* Castle Hills Zoning Ordinance § 31.400 *et seq.*

[13]  D's Mot. for Summ. J., Ex. 16.

[14]  *See* Castle Hills Zoning Ordinance § 31.1301 (a proposed use will be permitted if it "will not adversely affect the character and appropriate use of the area or neighborhood in which it is proposed to locate; will not substantially depreciate the value of adjacent and nearby properties for the use in accordance with the regulations of the zoning district in which they are located will be in keeping with the spirit and intent of this Chapter; will not adversely affect the implementation of the Comprehensive Plan; will comply with applicable standards of the district in which located; and will not adversely affect traffic, public health, public utilities, public safety, and the general welfare.").

While this dispute forms the basis of the instant lawsuit, the Church and City have worked together in the past to accommodate both the needs of the Church's facility and mission and the requirements of the City in the management of its health, safety and welfare. In fact, the City has granted multiple special use permits to the Church in order to accomplish its goals for expansion.  In order to accommodate its congregation, the Church built a sanctuary that, to this day, seats over 2000 members.  The Church also constructed the four story Love Building to be used for classroom space.  In 1995, the Church sought the City's permission to construct the Victory Building, a 52,000 square foot building for the Church's private, Christian school.[15]  The Victory Building was to contain high school classrooms, an administrative area, a gymnasium, group meeting rooms and Sunday Bible School classrooms.  Typically, in Zone "A" where the Victory Building is located, the zoning ordinance require that no building "exceed two standard stories in height."[16]  The Zoning Commission recommended approval of the plan, specifying a three-story building, on November 7, 1995, and City Ordinance No. 781 was passed, permitting the construction of, among other things, the Victory three-story building.[17]

At that same November 7 meeting, the Church presented a proposed use for the

---

[15]  Plf's Mot. for Summ. J., Ex. L, Min. of Castle Hills, Nov. 7, 1995 [hereinafter Nov. 7, 1995 minutes]. The minutes reflect that the approval of the Victory building was approval for a building three stories in height and that the building was constructed on the then-existing parking lot.

[16]  D's Mot. for Summ. J., Ex. 16, Castle Hills Zoning Ordinance § 31.403.

[17]  Plf's Mot. for Summ. J., Ex. L, 4. Ordinance No. 781 was passed on February 13, 1996. *Id. See also* D's Exs. 5, 8, 9.

Winston Lane properties, six residential lots located adjacent to the Church's campus, across South Winston Lane.[18]  The Church proposed that the property become a soccer field and running track.[19]  The proposal was withdrawn and deferred pending the submission of necessary letters of authorization.  As early as December of 1995, the City's legal counsel wrote a letter reflecting a need to balance the Church's interests with the concerns of neighbors and the surrounding community regarding growth.[20]

Some time after the passage of Ordinance No. 781, permitting the Victory building's construction, problems in construction emerged and a solution was presented that required the construction of a fourth floor.[21]  The City Manager responded to this proposed change in the plan, stating that the City was "in concurrence that the change is feasible as long as the newly created space [the additional floor] is utilized solely for storage."[22]   The City permitted the construction of the fourth floor to be used as storage space, however the condition placed on the use of the space was unclear because the City also communicated

---

[18]  At that time, 1995, the Church owned three of the residential lots and planned acquisition of the other three.  D's Ex. 5, Letter from Overland Partners, Inc. to City Manager, dated Oct. 19, 1995.

[19]  Nov. 7, 1995 minutes.

[20]  Plf's Mot. for Summ. J., Ex. L, at 2.  This early letter discusses most, if not all, of the issues that were to later affect the Church and City with the proposed SUPs that form the basis of this litigation.

[21]  D's Mot. for Summ. J., Ex. 28.

[22]  Plf's Mot. for Summ. J., Ex. L, at 5.  The letter also specified that "[i]n the event that the space is to be utilized for any other purpose, particularly for classrooms, meeting room, etc., the plans would have to be resubmitted to the Architectural Review Committee. . . .I would have to initiate the public notice process for announcing the meeting of the ARC. . . .you would be required to make a presentation that demonstrates compliance and verifies the need for this change."  Id.  See also Plf's Mot. for Summ. J., Ex. L-44, at 19.

that the Church might later apply for a changed use.[23]  In 1999, the Church applied for a special use permit to occupy the fourth floor space of the Victory Building.  By the City's own admission, it refused to accept the Church's application on the grounds that the proposed use conflicted with the original SUP.[24]  Thus, the City did not conduct a merits based review of the Church's application for a permit to specially use the existing fourth floor of the Victory Building as classrooms, even though the City's agent had officially communicated to the Church that it might pursue such a permit in the future.  The Church's fourth floor permit application is not barred by the language of Ordinance No. 781.[25]  The effective denial of the Church's fourth floor special use permit was a procedural one, based upon the City's position that the application conflicted with the earlier issued special use permit and therefore did not merit substantive review.

On December 17, 1998, the Church filed an SUP application to convert the Winston Lane properties – six residential lots, previously purchased by the Church – into an additional parking lot with approximately 300 spaces.[26]  The total size of the proposed parking lot is six acres.[27]  The City granted demolition permits to the Church for the limited purpose of razing

---

[23]  Plf.'s Mot. for Summ. J., Ex. L-5.

[24]  "The City refused to accept this [fourth floor occupation] application and any other applications for an SUP, because it was in conflict with the agreement made by the Church and because it was in conflict with the original SUP."  D's Reply, at 8-9.  Neither party has presented evidence to contradict the City's admission, nor evidence demonstrating that the City substantively reviewed this application.

[25]  Plf's Mot. for Summ. J.,  Ex. L-4.

[26]  Plf.'s Mot. for Summ. J., Ex. G.

[27]  D's Mot. for Summ. J., Ex. 41; Depo. of Bob Anderson, at 75.

the homes that had existed on the six lots,[28] and the Church demolished the homes.  The

Court takes judicial notice of the fact that the six lots currently sit empty, covered in grass

and trees.  During the extended period of dispute and litigation between the parties, the City

has permitted, on multiple occasions, the temporary use of the lots for parking during special

and highly attended Church events.[29]

There is some dispute as to whether the current Church parking lot provides sufficient

parking spaces for the size of the Church or the number of church-goers, according to City

Code, in part because the City's Code specifies several methods for calculating the required

number of spaces.[30]  In January of 1996, the City Manager wrote to the Church's architect

and plainly stated that the Church was in violation of City requirements for off-street parking,

despite the Church's arrangement with surrounding business for a "cooperative parking

agreement" on Sunday mornings.[31]   The Church disputed the violation and opposed the

---

[28] D's Mot. for Summ. J., Ex. 13.

[29] D's Mot. for Summ. J., Ex. 54. The temporary "dirt" parking permit is always conditioned upon additional safety requirements, such as lighting and security to be provided by the Church. *Id.*

[30] The zoning ordinances that apply to the Church's Zone "A" do not provide for parking requirements because a church is one of the uses within Zone "A" that requires a SUP. Castle Hills Zoning Ordinance § 31.401(2), § 31.401(12). Parking requirements are found in section 31.1004, which appears under the section pertaining to Zone "G" for general businesses. Section 31.1004(6) provides: "(a) Churches. . .shall have a minimum of one parking space per four seats or a minimum of one parking space per 800 square feet of specified outdoor recreational area plus a minimum of one parking space per 200 square feet of indoor recreational area, plus a minimum of one parking space per 100 square feet of associated indoor use. (B) Churches: Off-street parking space shall be provided on the lot to accommodate a minimum of three spaces for each 200 square feet of net floor area or .20 (1/5) spaces per sanctuary seat (including ministers and choir), whichever produces the greater number of spaces." Castle Hills Zoning Ordinance § 31.1004(6).

[31] Plf's Mot. for Summ. J., Ex. L-3.  At that time, the City found the Church to be thirty-six parking spaces short of compliance with City Code.

method by which the City arrived at its conclusion. However, this dispute is not material as to preclude summary judgment because neither party now claims that the Church's parking is legally insufficient. Rather, the Church claims that the existing parking is insufficient because new members cannot be attracted and current members will drive away before attending service out of frustration, even when the existing lot is not filled to capacity.[32] Both parties demonstrate to the Court that the heart of the issue is the expansion of parking for planned Church growth and not the sufficiency of parking for existing Church members.

Prior to the filing of the parking lot SUP application, the Church hired a consulting engineering firm to serve as the project engineer and to aid in the SUP application process.[33] The engineering firm also performed a "Traffic Impact Analysis" in May of 1999 "to determine the effects of the proposed parking lot and existing parking lot on Winston Lane" and to analyze "a proposal to minimize the duration of peak hour traffic generated by the church on Sunday."[34] In addition, issues of drainage on the Winston Lane roadway existed, such that in 1987 the Church and City agreed to share the cost of drainage improvements and later the Church with the permission of the City Manager assisted in the cleaning and maintenance of the culverts along Winston Lane.[35]

---

[32] Plf's Mot. for Summ. J., Ex. A. "The existing parking lot is at a state of near capacity. . . ." *Id.* at 4.

[33] Plf.'s Mot. for Summ. J., Ex. G.

[34] Plf.'s Mot. for Summ. J., Ex. G, Traffic Impact Analysis, at p. 1.

[35] *See e.g.*, Plf.'s Mot. for Summ. J., Ex. 43; Depo. of Dorothy Harle, at 27-28.

On three occasions, a public hearing was held before the Zoning Commission on the Church's parking lot SUP application.[36] Amidst the public hearings, on March 9, 1999, the City adopted Ordinance 859, amending prior zoning ordinances. On May 16, 2000, the City adopted Ordinance 884, again amending zoning ordinances, especially concerned with adverse affects of traffic, public health, public utilities, public safety, and the community's general welfare. The Church challenges theses amendments.

In June, the City Council met to consider the parking lot SUP, approved a committee to conduct further review of the application, and requested additional analysis of the issue.[37] On July 13, 1999, the City Council voted to accept the Zoning Commission's recommendation to deny the Church's SUP application for the parking lot.[38] During the review process, the City determined that drainage and traffic concerns were not adequately addressed by the Church's plan and that sufficient off-site parking existed to meet the Church's needs, or in the alternative that an above or below ground lot on the Church's existing parking facilities could address the Church's need.

On October 18, 1999, the Church filed its Original Complaint in state court in Bexar County, Texas against the City. The parties were ordered to mediation, during which time, the Church filed three alternative SUP applications for the proposed parking lot.[39] In response to which, the Zoning Commission met on March 7 and June 6, 2000 and voted to deny the applications. The City Council approved this recommendation on June 13, 2000. Also, the City indicated its intention that the Winston properties be used only for residential

---

[36] Plf's Mot. for Summ. J., Ex. 7 (March 2, 1999; April 6, 1999; and June 1, 1999). By the June 1, 1999 meeting, opposition to the Church's parking lot gained support, and a petition opposing the parking lot was signed and presented to the Commission at the June meeting. *See* Plf's Mot. for Summ. J. at Ex. 9.

[37] Plf.'s Mot. for Summ. J., Ex. 10, 13.

[38] Plf.'s Mot. for Summ. J., Ex. 15.

[39] D's Mot. for Summ. J., Ex. 19-21, 27.

purposes, parks and recreational use and parking consistent with residences and mixed-use development.[40]  The statement did not preclude religious use of the Winston properties.

Over a year later, on June 26, 2001, a public hearing was held on the Church's SUP applications.  There, Dr. David Pugh presented a report of the evaluation of the SUP applications, made at the City's request, and at that time, the City Council denied all three of the Church's SUP applications for the parking lot.[41]

## ANALYSIS

### I. Standard for Summary Judgment

Summary judgment is appropriate if, after adequate time for discovery, there is no genuine issue of material fact and a party is entitled to judgment as a matter of law.[42]  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor."[43]  The movant bears the burden of demonstrating that no genuine issues of material fact are in dispute.

Where the issue is one for which the nonmoving party bears the burden of proof at trial, it is sufficient for the moving party to identify those portions of the record which reveal the absence of a genuine issue of material fact as to one or more essential elements of the nonmoving party's claim.[44]  A dispute as to a material fact is genuine if the evidence is such

---

[40]  Res. No. 0007-01; Minutes, City Council Meeting (Jul. 11, 2000).

[41]  Plf.'s Mot. for Summ. J., Ex. 28.

[42] FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).

[43]  *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)).

[44]  *Celotex*, 477 U.S. at 323-24.

that a reasonable jury could return a verdict for the party opposing summary judgment.[45] Upon viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the court must be satisfied that no rational trier of fact could find for the party opposing the motion, as to each element of its case.[46] Here, both parties agree that there are no genuine issues of material fact in dispute, and that therefore the case is suited for judgment based upon the resolution of questions of law.[47]

## II. Substantial Burden on Religious Exercise

In the context of RLUIPA and the federal constitutional challenges, the Church seeks summary judgment on the issue of "substantial burden," that is, the Church's claim that the City's denial of the two SUPs imposed a substantial burden on religious exercise. Because the determination of the "substantial burden on religious exercise" element affects most of Plaintiff's claims, the Court begins here.[48] Moreover, the determination of whether Plaintiff demonstrated a substantial burden on religious exercise should be the same under both

---

[45] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[46] *Id.*

[47] *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

[48] In order for Plaintiff to make a *prima facie* case for a RLUIPA violation, the Church must demonstrate that Defendant City's conduct in denying the special use permits (1) imposes a substantial burden; (2) on the "religious exercise;" (3) of a person, institution, or assembly. 42 U.S.C. § 2000cc(a)(1). *See also Westchester Day School v. Village of Mamaroneck*, 280 F.Supp.2d 230, 239 (S.D.N.Y. 2003). Upon such a showing, the burden shifts to the City to show that the zoning conduct is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000cc(a)(1)(A)-(B). *See also Westchester Day School*, 280 F.Supp.2d at 239. A determination of substantial burden in the Church's favor will also trigger strict scrutiny, as discussed infra, in the context of the federal constitutional challenge under section 1983. Therefore, the Church errs in so much as it requests that the Court first determine that strict scrutiny is required and then determine whether a substantial burden exists. *See Hicks v. Garner*, 68 F.3d 22, 26 (5th Cir. 1995); *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (per curiam); *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1224 (C.D. Ca. 2002) (distinguishing for this reason *Rector, Warden, and Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 357 (2d Cir. 1990)); *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Haw. 217, 247 (Haw. 1998) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 218, 92 S.Ct. 1562, 32 L.Ed.2d 15 (1972)).

RLUIPA and a constitutional free exercise challenge for two reasons.  RLUIPA itself contains no statutory definition for "substantial burden," but its legislative history instructs that the term indicates that Congress intended for the term to be defined by prior federal case law.[49]   Also, RLUIPA was enacted in an effort to codify existing Supreme Court jurisprudence.[50]   Therefore, to craft differing understandings of "substantial burden on religious exercise" under the case law and under the statute would contravene the intent of Congress.  A unified judicial approach to the term under both the RLUIPA statute and a constitutional challenge simply makes sense.

Although clear that a substantial burden is both greater than a mere burden[51] and greater than an inconvenience,[52] the Supreme Court's treatment of the term varies.[53]  The high court has over time declared that: criminal statutes imposing Sunday closing laws are an impermissible indirect and economic burden;[54] the building of a road and harvesting of timber on publicly owned land, used in traditional Native American religious ceremonies,

---

[49] *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760-61 (7th Cir. 2003) ("Although the text of the statute contains no similar express definition of the term 'substantial burden,' RLUIPA's legislative history indicates that it is to be interpreted by reference to RFRA and First Amendment jurisprudence. *See* 146 CONG. REC. 7774-01, 7776 ("The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise")).

[50] *See* Joint Statement, 146 Cong. Rec. at S7775; H.R. Rep. No. 106-219, at 17.  *See also Freedom Baptist Church of Delaware City v. Township of Middletown*, 204 F.Supp.2d 857, 868-69 (E.D. Pa. 2002)

[51] *Civil Liberties for Urban Believers*, 342 F.3d at 761.

[52] *Bryant*, 46 F.3d at 949 (substantial burden "must be more than an inconvenience") (quoting *Graham v. C.I.R.*, 822 F.2D 844, 850-51 (9th Cir. 1987), *aff'd sum nom. Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989)).  *See also Guru Nanak Sikh Society of Yuba City v. County of Sutter, et al*, No. Civ. 02-1785-LKK/GGH, slip op. at 22-28 (E.D. Ca. Nov. 19, 2003).

[53] *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

[54] *Braunfeld v. Brown*, 366 U.S. 599, 613 (1961).

falls short of a substantial burden;[55] and the denial of unemployment benefits to one who terminates his job due to a religiously motivated refusal to create armaments to be a substantial burden.[56]

While the Court might look to the Fifth Circuit and the Supreme Court's treatment of the term "substantial burden" in any number of contexts, including free speech jurisprudence,[57] the Court declines to do so and instead focuses its analysis to the issue of substantial burden on religious exercise.[58]  Reference to the larger context of the concept, substantial burden on religious exercise, is more helpful and precise than attempting to define what is a "substantial burden" alone.[59]  Pinpointing the line between substantial and inconvenience may be aided by reference both by the degree of the burden as well as the implicit effect on the religious exercise.  The two do not operate in a vacuum, one without the other, but are instead interdependent.  The Fifth Circuit recognizes this principle and has in the past addressed the whole concept: "Regulatory statutes or ordinances that affect religious activity are constitutional so long as they impose no undue burden on the ability of the church or its members to carry out the observances of their faith."[60]  In that same opinion,

---

[55] *Lyng*, 485 U.S. at 450-51.

[56] *Thomas*, 450 U.S. at 718.

[57] *See e.g., Murphy v. Zoning Commissioner of Town of New Milford*, 148 F.Supp.2d 173 (D.Conn. 2001); *Grace United Methodist Church v. City of Cheyenne*, 235 F.Supp.2d 1186 (D. Wyo. 2002).

[58] *See Guru Nanak Sikh Society of Yuba City*, slip. op. at 24-25.

[59] "The very concept of a substantiality test implies a subjective weighing process. Judicial inquiry under a substantiality test must therefore be subjective if courts are to be sensitive to different contexts. Even so, a few guiding principles can be discerned." Michael C. Dorf, "Incidental Burdens on Fundamental Rights," 109 HARV. L. REV. 1175, 1216 (1996) (discussing the determination of a substantial burden in the context of RFRA).

[60] *Islamic Center of Mississippi, Inc. v. Starkville*, 840 F.2d 293, 298 (5th Cir. 1988) (citing *Yoder*, 406 U.S. at 214). The Court notes that *Islamic Center* issued prior to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990) (holding that constitutional protections of religious freedom do not relieve the obligation to comply with neutral and generally applicable laws).  Given the

the Fifth Circuit rejected a city's claim that the denial of a permit was based solely on concerns of traffic control and public safety, and found the burden on religious exercise to be substantial because the denial of the special use permit "left no practical alternatives for establishing a mosque in the city limits."[61]

The Fifth Circuit offered four other examples of a substantial burden on religious exercise, three of which are relevant to the instant inquiry, in *Hicks v. Garner*.[62] First, a burden is substantial when the believers demonstrate that the government's conduct prevents them "from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine."[63] Second, a burden exceeds the substantiality threshold when the government either compels conduct in contravention of the adherent's beliefs or requires the adherent to refrain from conduct that is required by religious beliefs.[64] Finally, the burden is substantial "where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.

---

purpose and effect of RLUIPA, life is breathed into the pre-*Smith* religious freedom cases once again, in so far as those cases inform the terms and concepts of a strict scrutiny approach to religious freedom cases in the prisoner and individualized assessment land-use context.

[61] *Islamic Center*, 840 F.2d at 302.

[62] *Hicks*, 69 F.3d at 26, n.22. The footnote provided guidance to a district court on remand of a RFRA claim. The fourth example applies in the context of a prisoner's challenge, and is not relevant to the instant matter.

[63] *Id.* (citing *Bryant*, 46 F.3d at 949 and *Morris v. Midway Southern Baptist Church*, 183 Bankr. 239, 251 (D.Kan. 1995)).

[64] *Id.* (citing *Morris*, 183 Bankr. at 251).

. . ."[65] Although these standards are the Fifth Circuit's guidance with respect to RFRA, they apply to the evaluation of a substantial burden on religious exercise in the context of RLUIPA and § 1983 challenges as well.[66]

Here there are two separate actions that the Church alleges substantially burden the religious exercise of the community and its members: the denial of a special use permit to allow the use of existing fourth floor space for classrooms and the denial of a special use permit to allow the construction of a supplemental parking lot.

## A. Denial of the Fourth Floor Special Use Permit

The City's refusal to accept the Church's SUP application for use of the existing fourth floor works a substantial burden upon the Church's religious exercise because it failed to consider potential changes in the Church's religious needs for their existing religious education facilities and because it mistakenly relied on a past permit, which addressed related but not identical use issues. The Court's determination of this point does not address the situation where a similar application is filed and denied by the City after substantive review; for under those facts, the denial might not work a substantial burden on religious exercise.

The Church argues that the City's refusal to accept the application is a substantial burden on religion because the City cannot offer a justification for its conduct.[67] This argument takes the cart before the horse, and focuses upon the wrong inquiry. First, the argument attempts to determine whether the City has a compelling interest in denying the proposed use, prior to determining whether a substantial burden exists. Second, the Church's argument on this point focuses upon the denial of the proposed use. The record demonstrates

---

[65] *Id.* (citing *Woods v. Evatt*, 876 F. Supp. 756, 762 (D.S.C. 1995) (citations omitted)).

[66] *See* 146 Cong. Rec. E1563-01 (Sep. 21, 2000) (statement of Rep. Canady).

[67] The Church cites to various depositions in which City agents and officials admit they do not know why the City would deny the use of the fourth floor space, and do not know of any justification for doing so. *See e.g.*, Plf.'s Mot for Summ. J., Ex. 46, at 14-15; Ex. 49, at 17.

that the City has never substantively reviewed the Church's SUP application for use of the Victory building's fourth floor.[68]  Thus, the question of substantial burden must focus upon the refusal to accept the application, not the denial of the use.  On a different record, the Church might present argument that the denial of the use works a substantial burden upon religious exercise, but the resolution of that scenario must be left for another controversy which presents evidence on the issue.

The City believed that the Church attempted in bad faith to conceal the fourth floor as mechanical space in order to construct it without the City's objection, all the while allegedly intending to later use the space for occupancy but promising the City that future use was not planned.[69]  The Court finds no such treachery in the record.  Instead, the evidence demonstrates that the City approved, for whatever reasons, the construction of the additional space in the Victory Building.  That additional space in fact, if not in the City's terminology, forms a fourth floor.  The City Manager indicated to the Church that opportunities to apply for a change in use of that space existed and detailed how that opportunity might be triggered.  The Church now wishes to take advantage of that opportunity and apply for an SUP to occupy that existing space.

A municipality that refuses to accept and consider a special use permit application from a place of worship related to the occupancy of already existing facilities works a substantial burden upon religious exercise where the proposed use is religious education because in the case of a place of worship, facilities' uses may change in order to suit the

---

[68]  Neither party points the Court to evidence of the application's substantive review, and on the Court's independent and extensive search for such evidence, none was found.  On the contrary, the City admits, but attempts to soften, the fact that the application was rejected before substantive review, not denied after the completion of the review process.  D's Mot. for Summ. J. (Docket No. 52), at 44-45.

[69]  *Id.* at 45.  "Because the Church failed to comply with conditions of the SUP by materially altering the Roof Level in anticipation of its use as occupied space, attempted to hide the altered space by labeling it "mechanical" in the plans approved by the City . . . the *rejection* of the SUP applications for occupancy of space finished-out without authority is appropriate."  *Id.* (emphasis added).

needs of either religious faith or practice.[70]  A city may not simply refuse to consider a proposed change in use on the grounds that a prior permit or condition thereon addressed the use, especially in this instance, where the prior permit did not clearly condition the use, as the City claims.  The City's refusal to accept the Church's fourth floor SUP application is a substantial burden on a sincerely held religious belief because it entirely precludes the Church from seeking a permit needed for religious use of existing property and facility.  In so doing, the City treads across the line for substantial burden indicated by the Fifth Circuit in *Hicks*; the City comes too close to requiring the Church to refrain from conduct required by religious beliefs.[71]  The requirement comes not as a regulation for conduct, but rather as a refusal to consider the Church's change in need for the religious use of existing educational facilities.

The City claims that the non-occupancy of the fourth floor was an implied condition of the prior SUP that permitted the construction of the Victory Building.  The evidence does not support this argument.  The City Manager conveyed in writing to the Church that any future change in use, from storage to occupied use, would require that the permit process be reinitiated.  Moreover, if the evidence did support such an argument, the City could not defend its refusal to accept the Church's SUP application and refusal to subject it to the appropriate review process  by simply stating up front the reasons for an ultimate possible denial.  Places of worship, unlike other land users, will have religiously motivated reasons to alter the use of property, even in some instances when a prior permit specifies the permissible use.  The Court finds that in this respect the City became lax with its zoning application review procedures, and especially in the context of free religious exercise, the

---

[70] *See Alpine Christian Fellowship v. Pitkin County*, 870 F.Supp. 991, 994 (D. Colo. 1994). *See also Bryant*, 46 F.3d at 949 (substantial burden exists when state action "prevent[s] him or her from engaging in conduct or having a religious experience that is central to the religious doctrine.").

[71] *Hicks*, 69 F.3d at 26 n.22 (citing *Morris*, 183 Bankr. at 251).

City's vigilance to process is required.[72]

Finally, the City argues that the Church is barred from raising the argument of substantial burden with respect to the fourth floor space because of the doctrine of unclean hands. There are several problems with this defense and with the City's defenses to the substantial burden issue generally. The Church has made an applied challenge to the City's conduct, and the City responds with a defense of the zoning ordinances on their face. The Church does not argue that the zoning ordinances are facially improper or on their face unconstitutional. Rather, the Church argues that as applied in these two specific instances, the ordinances *and* the zoning process that resulted in a denial of the permits worked a substantial burden on the Church's religious exercise. To this argument, the City has not provided a compelling or relevant defense. The City merely states that "Plaintiff has failed to prove that Defendant 'substantially burdened' its free exercise of religion" and relies upon a defense of the zoning ordinances themselves to bolster that bare statement.[73] However, a "regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion."[74] The City cannot defend the grant or denial of a particular special use permit with reference to the plain language of the zoning ordinance on its face. The power to grant or deny a special use permit is a quasi-judicial function with inherent broad discretion to carve out individual exceptions to a zoning ordinance.[75] Thus, when the use of that power is challenged in an individualized application, the municipality may not effectively respond by

---

[72] *See generally* 2 ANDERSON'S AMERICAN LAW OF ZONING § 12.23, at 584-85 (Kenneth H. Young ed., 4th ed. 1996). *But see Civil Liberties for Urban Believers*, 342 F.3d at 767-68 (discussing the limitations of a facial due process challenge to zoning procedures in federal court).

[73] D's Resp. to Plf's Mot. for Summ. J., at 13.

[74] *Yoder*, 406 U.S. at 220 (citations omitted).

[75] *See Shelton v. City of College Station*, 780 F.2d 475, 489-90 (5th Cir. 1986). *See also* 3 ANDERSON'S AMERICAN LAW OF ZONING § 21.17, at 769-772 (Kenneth H. Young ed., 4th ed. 1996).

pointing only to the ordinance itself. Just as in the context of eligibility for unemployment compensation, the eligibility for a special use permit amidst zoning ordinances "invite[s] consideration of the particular circumstances behind" an application.[76]

Although not necessary, the Court notes that a substantial burden would likely be worked upon the Church if the fourth floor permit were denied after substantive review. The Church has alleged and provided evidence that the denial of the use of the existing fourth floor substantially burdens both the number of children who can be educated and the quality of the educational programs offered.[77] The Court has no reason to doubt that this allegation could quite simply be demonstrated, if a subsequent action were brought with supporting evidence of permit application's substantive review and denial.[78]

Because the Court finds that the Church showed a substantial burden upon religious exercise in the City's refusal to substantively consider the Church's application for fourth floor use, the Court need not address the other grounds for triggering strict scrutiny on this claim. Rather, based upon this finding, the Church is entitled to strict scrutiny review of the City's denial of this permit application.[79]

### B. Denial of the Parking Lot Special Use Permit

The Church's second substantial burden claim involves the City's denial of SUP applications for the parking lot construction. The Church claims that denial of the permit to proceed with the parking lot works a substantial burden upon the Church's religious exercise because it prevents worshipers from attending service and because it prevents the Church from engaging in an element of religious conduct, that is, the recruiting of new members ".

---

[76] *Smith*, 494 U.S. at 884 (citing *Bowen v. Roy*, 476 U.S. 693, 708 (1986)).

[77] *See* Plf's Response to D's Mot. for Partial Summ. J. (Docket No. 102), at 26.

[78] *See e.g., Westchester Day School*, 280 F.Supp.2d 230.

[79] 42 U.S.C. § 2000cc(a)(2)(C).

. . to Christ, to enlist them as members, to educate them to maturity, to equip them for a meaningful ministry in the church and a life mission in the world, in order to magnify God."[80] The Court disagrees.

Inherent in any religion is a community of worship, rather than just the faith or conduct of a lone worshiper.[81]  Physical access to a community of worship is crucial to a religious observer's ability to practice both faith and religious conduct within the community. A governmental regulation that precludes such access to the worshiping community presents a substantial burden to the religious exercise.  In this case, however, physical access is not precluded; rather the parties dispute how much physical access – in the form of parking – is necessary.  Of course, the Church desires as much parking as possible to accommodate both existing and hoped for members, while the City desires as little Church parking as possible to preserve the residential quality of the neighborhood.  Each goal is reasonable, and the tension presents precisely the type of balancing that is required of a municipality in exercising its zoning powers.

Here, the Church is not denied physical access by the ordinance or the application of it in the multiple denials of the SUP.  The Church enjoys significant parking in its current lot, and importantly, the size of the existing lot meets the City's standards for the size of the sanctuary it must serve.[82]  Additionally, the Church's arrangements with neighbors provides ample additional parking on Sundays for services.  Thus, the current parking – in all its forms

---

[80]  *See* Plf.'s Mot. for Summ. J., Ex. B, Aff. Pastor Bruce Coe.

[81]  *See Islamic Center*, 840 F.2d at 300 ("The assembly of those bound by common beliefs and observances not only serves to create a sense of community among the members through the shared expression of their beliefs, it also communicates to outsiders the church's identity as a group devoted to a common ideal.... If government exercises its power to affect group worship, it must demonstrate at least that the burden imposed serves an important government purpose and also that this purpose could not be accompanied by a means less burdensome to the exercise of religion.").

[82]  Plf's Mot. for Summ. J., Ex. L, 4.  Ordinance No. 781 was passed on February 13, 1996. *Id. See also* D's Exs. 5, 8, 9.

– is adequate for the current Church.  The Church submits evidence that parishioners dislike the borrowed parking because it involves a walk of some distance, as well as the crossing of a busy thoroughfare.  Yet, it is the City, not the Church, that is the entity entitled to enforce the adequacy of parking under municipal ordinance.  Therefore, the Church's allegation that the existing parking is insufficient is not a legal conclusion.  But, the City's SUP that includes a provision for certain, allotted parking to the Church may in the future bar the City from asserting that the Church's parking is inadequate.[83]

There is no doubt that the City's denial of the parking SUP is a burden upon the Church, upon its members and upon their religious exercise.  The Court accepts the Church's contention that its genuine and compelling religious convictions require it to increase its own membership and encourage new members to join the congregation.  In order to do so, the Church ideally would have an unlimited and ever-expanding place of worship with open doors and a parking space for all who would enter.  The City burdens this religious hope and plan – the sincerity of which this Court has no reason, nor jurisdiction, to question – with the denial of the parking SUP.  However, the Church's ideal situation need not be afforded protection by the City, and the City's burden upon religion in this instance is neither substantial nor undue.  Indeed, the City has suggested alternatives of additional parking either below or above the existing parking lot, demonstrating that the City's interest is not to prevent or diminish Church attendance.  By denying the parking SUP, the burden worked upon the Church is one of financial cost and inconvenience, as well as the frustration of not getting what one wants.  None of these burdens, however, is substantial and none rises to the

---

[83] The City, in taking the position that it has on this issue, has placed itself in a delicate position. The City is equitably barred from a future challenge to the adequacy of the parking for the existing Church facility, and in any future proposals from the Church for development, the City will have to carefully address the adequacy of parking, both to permit parking when necessary to conform with municipal ordinance and to not require additional parking after having denied the Church this opportunity to build it. The City avers that a different parking project application, possibly a multi-level structure, would be more favorably received, thus indicating that the City has not flatly refused all Church proposals for proposed parking.

level necessary to trigger strict scrutiny under the free exercise clause of the First Amendment.

It is rare that a scenario will present the fine line of factual distinction upon which a legal standard turns; however, the Court finds this case to do precisely that on this issue. The Church's existing parking lot is sufficient for the current size of the Church, at least under one formula provided by municipal code and, more importantly, under the special use permits that authorized all of the existing construction, each of which had to consider the effect of the additional proposed use on parking in its analysis of the proposal's impact on the safety and welfare of the neighborhood. In addition, the Church enjoys relationships with surrounding commercial neighbors, who permit churchgoers to use the nearby commercial lots on Sundays. This is not a situation in which the City's conduct prevents people from attending a service and worshiping as they choose. Unlike the mosque in *Islamic Center of Mississippi*, the Church is not "relatively inaccessible," but is in fact quite accessible by various means.[84]

The City's denial of the parking SUP does not leave the Church without practical alternatives.[85] Rather, this is a situation in which a successful church hopes to be more so, but the questions remain, just how much parking does a church need and how much parking must the City permit it. Surely, the answer is not whatever amount the church desires. The answer must be a reasonable amount, to be determined by the City or other governing body, in the absence of unacceptable religious discrimination. The Court takes that issue next.

### III. Religious Discrimination

A showing of discrimination against religious exercise may also trigger strict scrutiny

---

[84] *Islamic Center*, 840 F.2d at 299.

[85] *See id.* at 302.

review for a challenge grounded on RLUIPA,[86] and section 1983.[87]  Therefore, the Church seeks summary judgment on its claim that the City's conduct and denial of both proposed site changes is religious discrimination that triggers strict scrutiny.  The Court suspects that this argument need not be addressed with respect to the fourth floor SUP given the resolution of the issue of substantial burden and the resulting requisite standard of review.  However for the parking claim, the Church cannot demonstrate a substantial burden on religious exercise.  Discrimination against religious faith or conduct may trigger strict scrutiny review because in that instance the regulation is not neutrally applied, as required by *Smith*.[88]  The Church argues that discrimination triggers strict scrutiny, even in the absence of a substantial burden, but the Court finds no such religious discrimination to exist here.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, the Supreme Court struck down municipal ordinances amidst strict scrutiny review, upon a showing that the City's Ordinances were not generally applicable but were instead applicable only to religiously motivated conduct.[89]  However, *Hialeah* cannot stand for the proposition that a City's motive is relevant to that inquiry, but must instead be read to condemn unequal treatment between secular conduct and the same conduct when instituted for religious reasons.[90]  This distinction is relevant because the Church argues that religious discrimination

---

[86] 42 U.S.C. § 2000cc(b) (combining religious discrimination and exclusion into three subsections: "equal terms," "nondiscrimination," and "exclusions and limits").

[87] *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993).

[88] *Smith*, 494 U.S. at 879.  *See also Kickappo Traditional Tribe of Texas v. Chacon*, 46 F. Supp. 2d 644, 653-54 (W.D. Tex. 1999) ("even a facially neutral law may not withstand scrutiny if interpreted or applied in a discriminatory manner").

[89] 508 U.S. 520 (1993) [hereinafter *Hialeah*].

[90] *See id.* at 542; Douglas Laycock, "Article: The Supreme Court and Religious Liberty," 40 CATHOLIC LAW. 25, 28 (2000) (clarifying by reference to the justices' votes that *Hialeah* speaks to the issue of disparate treatment and not discriminatory motive).

exists as a result of the City's alleged hostility toward the Church or the Baptist religion and alleged intent to stunt the Church's growth. Even if the Church's evidence demonstrated such animus, it is not relevant under a close reading of *Hialeah*, which required strict scrutiny when the evidence showed disparate treatment of religious conduct versus similar conduct in a non-religious context, as opposed to a motive of religious discrimination. Moreover, the evidence adduced does not support a finding of such discriminatory motive. Also, there have been no allegations nor evidence of religious discrimination as inferred from disparate treatment.[91] As a matter of law, the Court finds no claim for municipal discriminatory motive and declines to read one into *Hialeah* or its progeny. As a matter of fact, the Court finds that the Church has not made any showing of unequal treatment.

The Church raises two general grounds for the alleged hostility toward religion, the City's modification of its ordinances and the negative interactions between the City and the Church. The Court addresses each in turn.

## A. Modifications to Ordinances

The City amended existing ordinances on the eve of the Church's application. This timing is, at a minimum, suspicious. Neither the amendment, nor the timing, however are sufficient to bring this dispute in line with the discrimination in *Hialeah*. There, it was evident that the "ordinances target[ed] Santeria sacrifice" and a "necessary conclusion that almost the only conduct subject to [the relevant] Ordinances. . . is the religious exercise of Santeria church members."[92]  In contrast, this City struggles against size, not religious practice. Here, the undisputed facts reveal a long-lasting antagonism between Church and City that is rooted in a struggle over size of the Church and size and character of the

---

[91] *See Prater v. City of Burnside*, 289 F.3d 417, 429 (6th Cir. 2002) (citing *Vandiver v. Hardin County Board of Education*, 925 F.2d 927, 934 (6th Cir. 1991)).

[92] *Hialeah*, 508 U.S. at 535.

surrounding neighborhood.  There is no evidence here that the City harbors ill-will toward the Baptist faith or practice or worshipers, nor that the City means by its aggressive zoning decisions to alter or impede the religion in any way.[93]  Rather, the City means to halt this Church's growth, not spiritually, but geographically.   In another circumstance, this motivation might prove to be religious discrimination.  But not here because, in so doing, the City does not hope to curtail religious faith or conduct – not even with respect to the Church gaining new membership.  The City merely set a limit beyond which the Church cannot overtake the municipality, either by acreage or by architectural character.  These are precisely the kind of decisions that are left to cities, rather than courts.

The Church argues that the City passed Ordinances and Resolution 0007-01 specifically targeting First Baptist.  The evidence bears this allegation out.  But, this ordinance amendment is not religious discrimination.  An amendment alone, even pointed at a specific entity's application, does not constitute religious discrimination per se.  The Ordinance in this case, unlike the problematic ones in *Hialeah*,[94] do not target religious practice, but rather target the size of an entity.  This goal lies well within the careful consideration of a municipality's zoning governance.[95]  The Church also argues that the City's objection to the Church's size constitutes objection to religious practice, and is therefore discriminatory, because the Church is bound by sincere religious belief to grow in membership and therefore in size.  The Court has no reason to doubt the sincerity or

---

[93] This case does not parallel the situation in *Hialeah*, where evidence revealed that religious faith and conduct were targeted by the operation of the municipal ordinances. *See id.*

[94] *Id.*

[95] *See Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1224 (9th Cir. 1990).

centrality of the Church's belief in this regard,[96] but declines to accept that the Church is therefore entitled to unlimited growth within a community and is protected from any restrictions on growth by the City.

Furthermore, the manner of the denial of the parking lot SUP is not religious discrimination. The City denied the parking permit after the Church had, in the past, publicly indicated several uses for the land. Over time, the City heard the Church's desire to use the Winston Lane property as a playground for children, a running track and field, and before the houses were razed, a building for social meetings. The Church attempts to paint the situation as entrapment: the City knew of the Church's plans, even partially goaded them to build additional parking by claiming that the Church had insufficient parking under the zoning ordinances, permitted the Church to purchase the Winston lots and raze the existing homes, and then spitefully denied the parking permit application. This evidence reveals a far more subtle and far less discriminatory exchange between the parties and development of the issues.

## B. Negative Interaction

The Church also claims that it has made a showing of religious discrimination because of the City's treatment of the Church in general. Multiple instances are cited, even in the City's own briefing to this Court, in which the City refers to the Church as a cancer feeding upon healthy surrounding cells.[97] The Court's review of the evidence submitted by both parties reveals acrimonious relations between the City and Church for at least the past four years. In large part, this appears due to the conduct of several individuals acting on behalf of or in concert with the City. One particular individual, Former Mayor Anderson, repeatedly

---

[96] *See Kickapoo Traditional Tribe*, 46 F.Supp.2d at 652 (citing *Montgomery v. County of Clinton, Mich.*, 743 F.Supp. 1253, 1259 (W.D. Mich. 1990)).

[97] D's Mot. for Summ. J,. at 7-8.

indicated through word and deed his frustration with the Church.[98] To whatever degree this conduct constitutes poor taste and poor judgment, none of the conduct complained of rises to the level of religious discrimination or exclusion. Were there a cause of action for facilities size discrimination, then the Church might have a claim. Rather, this record suggests no hostility or discrimination visited upon the Church that would not also have greeted a Wal-Mart or large hospital or university, where an entity's proposed growth threatened to outstrip the character and size of the city.

## IV. Applicable Standard of Review

The Church additionally claims that strict scrutiny is the proper standard of review of regulations that substantially burden religious exercise for seven distinct reasons. Because the Court holds in part that the City's denial of the parking lot permit is not a substantial burden on religious exercise, the Church's arguments for strict scrutiny on that issue need not be addressed. The Church's claim for additional parking is subject to rational basis review. With respect to the denial of the fourth floor use permit, however, the Church's arguments for the application of strict scrutiny yet require disposition.

*A. System of Individualized Assessments Rather Than Generally Applicable Regulation*

The Church argues that because the zoning review and determination occurs amidst a system of individualized assessments, a substantial burden on religion resulting from that process is subject to strict scrutiny. Although RLUIPA provides for strict scrutiny review in certain explicit circumstances, the Church urges strict scrutiny's application even without RLUIPA under the rule announced in *Employment Division v. Smith*.[99] There, the Supreme Court held that constitutional protections of religious exercise do not relieve the obligation

---

[98] *See* D's Mot. for Summ. J., at 53-55; Ex. 41, Depo. of Bob Anderson.

[99] 494 U.S. 872 (1990).

to comply with neutral and generally applicable law.[100]  However, the *Smith* court left some gaps in which strict scrutiny, the previously applicable standard based upon *Yoder* and *Sherbert*, survived as the proper standard of review for laws that substantially burden religious exercise.  One such exception to *Smith*'s rule of generally applicability and neutrality was the evaluation of a law characterized by "individualized assessments."[101]  Within such a system, when religion is substantially burdened, the government's regulation is not neutral and generally applied but risks that religion carry an additional and unnecessary burden.[102]  The applicability of strict scrutiny to the individualized assessment process was reaffirmed in *Hialeah*.[103]

Zoning, and the special use permit application process specifically, inherently depend upon a system of individualized assessment.  Moreover, courts have already recognized that land use regulations that require individualized assessment fall within the scope of the remaining strict scrutiny treatment left in the wake of *Smith* and *Hialeah*.[104]  This Court agrees.  The City's land-use decisions in this case are not generally applicable laws.[105]  The applied process of and results of a special use permit application will vary not only from one city to another, but even from one applicant to another within one jurisdiction.  The *Smith* majority opinion indicated that strict scrutiny survived as the appropriate analysis in instances

---

[100]  *Smith*, 494 U.S. at 890.

[101]  *Id.* at 884.

[102]  *See id.*

[103]  *Hialeah*, 508 U.S. at 537 (holding that an animal cruelty ordinance that required evaluation of the justification of the killings was a system of individualized assessment requiring strict scrutiny).

[104]  *Keeler v. Mayor & City Council of Cumberland*, 940 F.Supp. 879, 886 (D. Md. 1996); *Alpine Christian Church*, 870 F.Supp. at 994-95.

[105]  *See Cottonwood Christian Center*, 218 F.Supp.2d at 1222-23.

of individualized review where religious exercise suffered a substantial burden.[106] Here, the Church has demonstrated that the City's refusal to substantively review the SUP for the fourth floor of the Victory Building was a substantial burden upon religious exercise amidst a system of individualized government assessment and individualized exemptions. Thus, even outside the scope of RLUIPA,[107] in the context of the Church's section 1983 religious freedom claims, the City's outright denial of the Church's fourth floor permit application is subject to strict scrutiny. Were the denial of the additional parking SUP a substantial burden, then it too would be subject to strict scrutiny. Because the Court finds no substantial burden in that situation, rational basis review applies.

## B. Hybrid Rights Affected

Because the Court finds that Plaintiff's fourth floor SUP claims are subject to strict scrutiny review both under RLUIPA and section 1983, the Court need not address whether strict scrutiny is triggered by the alleged involvement of hybrid rights.[108] However, the Church suggests that because hybrid rights are affected, the Church's section 1983 free exercise claim related to the additional parking SUP is also subject to strict scrutiny. In *Smith*, the Supreme Court suggested in attenuated dicta that strict scrutiny might survive the *Smith* decision as the appropriate standard of review when "other constitutional protections

---

[106] *Smith*, 494 U.S. at 884. "The *Sherbert* test, it must be recalled, was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct. . . . our decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason." *Id.* (citing *Bowen*, 476 U.S. at 708).

[107] 42 U.S.C. § 2000cc-(a)(2)(C) (stating that RLUIPA applies when a substantial burden is imposed on religious exercise "in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.").

[108] *See generally Smith*, 494 U.S. at 881 (indicating in dicta that hybrid rights claims, those that involve not only the Free Exercise clause, but also "other constitutional protections such as freedom of speech and of the press" may be subject to strict scrutiny).

[in addition to the protection offered to free exercise of religion] such as freedom of speech and of the press" were implicated by the offending conduct.[109] The hybrid language in *Smith* served to distinguish the dispute at issue there from prior Supreme Court jurisprudence.[110] The Court contrasted the neutral and general application of a criminal law in *Smith* with prior cases in which the dispute centrally involved more than one constitutionally protected right.[111]    However, the contrasted cases "specifically adverted to the non-free-exercise principle involved."[112] The Court has already noted but will reiterate here that, quite simply, this case is about zoning and religious freedom and is an inappropriate case, if one exists at all,[113] for expanding the hybrid rights theory of triggering strict scrutiny.    A plaintiff cannot establish a hybrid rights claim merely by combining a substantial free exercise claim with tenuous claims and mere allegations of violations of other rights.[114]

Even were the Court inclined to recognize a hybrid rights claim absent the Fifth Circuit's instruction to do so[115] or the Supreme Court's clarification of the theory's inherent

---

[109]  *Id.* at 881.

[110]  *Id.*

[111]  *See e.g. Cantwell v. Connecticut*, 310 U.S. 296, 304-307 (1940); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943); *Follett v. McCormick*, 321 U.S. 573 (1943); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Yoder*, 406 U.S. 205.

[112]  *Smith*, 494 U.S. at 881 n.1.

[113]  *Hialeah*, 508 U.S. at 567 (Souter, J., concurring) (discussing that the hybrid rights rule creates an "untenable" dichotomous result).

[114]  *Miller v. Reed*, 176 F.3d 1202, 1207-09 (9th Cir. 1999).

[115]  Plaintiff cites *Society of Separationists v. Herman*, 939 F.2d 1207, 1216 (5th Cir. 1991), for the proposition that the Fifth Circuit adopted the hybrid rights claim, however that opinion was withdrawn on en banc rehearing, 959 F.2d 1283 (5th Cir. 1992).  In the initial opinion, the Court of Appeals indicated that "religion plus speech" cases survived the scope of the *Smith* holding, but the Fifth Circuit limited its statement to religion and speech interests, and that case centrally involved both rights because it addressed the religious nature of oaths and affirmations. *Society of Separationists*, 939 F.2d at 1216.  There is no such speech element in this case, and the Court declines to read the statement as a broad Fifth Circuit affirmation of the hybrid rights claim.

difficulties, the Church here has not demonstrated that the denial of the additional parking SUP worked a substantial burden on free exercise or a burden on any other constitutionally protected right.  As previously stated, the Court in an abundance of caution will grant an opportunity to make such a showing, but neither party has yet revealed the substance of such a claim.  Furthermore, the Court finds that the system of individualized assessments inherent in zoning applications and review would trigger strict scrutiny as to both of the Church's permits, but that as for the parking SUP, strict scrutiny is not reached because there was no substantial burden on religious exercise.[116]

## V. Strict Scrutiny Applied to City's Refusal to Accept Fourth Floor Occupancy Permit

The parties dispute whether the City acted with a compelling interest in refusing to consider the Church's application for use of the fourth floor of the Victory building. Compelling governmental interests are those that protect public safety, peace and order.[117] The City provides no compelling interest for refusing to consider the SUP application for the Victory Building's use.  Instead, the City argues that the prevention of neighborhood destruction is a compelling interest.  The substantial consideration of the Church's fourth floor SUP does not risk the destruction of Castle Hills.  To the contrary, arbitrary refusal to consider religious use variances or special use permits risks the destruction of a city in a larger and much more dangerous sense, the destruction of the process by which places of worship are afforded an opportunity to place their faith and practice within the community they serve.[118]  The Court questions whether the denial of the fourth floor permit, after

---

[116] *See Freedom Baptist Church*, 204 F.Supp.2d 857.

[117] *Yoder*, 406 U.S. at 230 (citing *Sherbert*, 374 U.S. at 402-03).

[118] *See Western Presbyterian Church v. Board of Zoning Adjustment*, 849 F.Supp. 77, 79 (D.D.C. 1994) (religious land use "ought not be arbitrarily restricted . . . because of unfounded or irrational fears of certain residents").

substantive review, could be justified by a compelling interest of neighborhood protection. The building exists. Despite the City's efforts to rename it, the fourth floor exists. The Church claims and provides supporting evidence that its religious education program requires the space's occupied use, and this Court finds no reason to doubt that assertion. Nor can the Court conceive of any reason why the occupation of the space by students, teachers and the like would destroy the surrounding neighborhood. In short, the City entirely fails to raise a compelling interest on this point.

Scant evidence suggests that the City's interest in refusing the Victory Building SUP application was the prevention of privacy invasion. As the Court understands it, the City feared that occupants of the fourth floor could see into the yards and homes of surrounding residential lots.[119] To whatever extent the City claims this is a compelling interest which justifies a refusal to consider a special use permit, the Court firmly disagrees. The City's interest in window coverings or foliage is not a compelling one and can be addressed by the manner in which a permit is granted, not by an outright refusal to consider a permit's application when at potentially stake is a religious institution's ability to use the land for religious conduct.

Because the Court finds that the City has raised no compelling government interest to justify the refusal of the Victory Building SUP, the Church must prevail on this element, and whether the refusal was narrowly tailored need not be addressed. Therefore, as to the fourth floor use permit, the Church is entitled to an entry of judgment on its claims for violations of federal constitutional protections of free exercise of religion and RLUIPA's prevention of substantial burden on religious exercise.[120]

---

[119] *See* D's Mot. Partial Summ. J., Ex. 1, Aff. of Helen Glass.

[120] Judgment will be entered for Plaintiff on claims I and XI as to the fourth floor permit.

## VI. Rational Basis Review of the Parking Lot Application

As previously discussed, strict scrutiny is not triggered as to the denial of the additional parking SUP because the Church has not demonstrated a substantial burden on religious exercise, religious discrimination or hybrid rights.  The City seeks summary judgment on the issue that its denial of the additional parking SUP is subject to rational basis review and meets that standard.

The City claims that the additional parking SUPs were largely denied based upon concerns of traffic and safety and supplements these grounds with concerns for the preservation of residential neighborhood quality.  Initially, after substantial review, the City denied the additional parking lot SUP based upon concerns heard from citizens and the City's concerns of drainage, traffic and the City's finding that the existing parking was more than adequate, and that the Church could build additional parking either above or below existing parking.[121]    The traffic concerns were particularly heightened because of substantial construction on the nearby West Avenue.[122]

"The zoning function is traditionally a governmental task requiring the 'balancing of numerous competing considerations,' and courts should properly 'refrain from reviewing the merits of such decisions, absent a showing of arbitrariness or irrationality.'"[123] The rational basis test for governmental action is familiar: the government's regulation is constitutional if there is "any conceivable rational basis" to support it.[124] The City, in denying the Church's

---

[121]    D's Mot. for Summ. J., Ex. 29-43, 45, 46, 48-54.  The Court wonders how a two-story parking lot would comport better with residential aesthetics than would an additional lot at ground level, but leaves this concern to the City's discretion.

[122]    *Id.*

[123]    *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121, 103 S.Ct. 505, 509, 74 L.Ed.2d 297 (1982). *See also Shelton*, 780 F.2d at 479.

[124]    *Shelton*, 780 F.2d at 477.

permit for additional parking, acted pursuant to the municipal ordinance which states that the "city council *may. . . authorize. . . .*"[125] In spite of the Church's multiple attempts to alter the design of the additional parking lot and to address the City's concerns regarding drainage and traffic, the City could reasonably and rationally have rejected all the plans for the additional parking or for the use of that land for parking entirely in order to protect the health, safety or welfare of the community.[126] The Church argues that the City had no rational interest to protect in denying the permit and attempts to color the City's interest as paranoid, arbitrary and unreasonable fears regarding neighborhood destruction and minor traffic concerns.[127] This argument is a mischaracterization of the facts and omits the City's rational interest in the protection and maintenance of the public welfare. Among other things, this interest includes the preservation of the community's beauty, spaciousness, health, cleanliness, balance, and safety.[128] In this case, the evidence demonstrates that the City based its decision to deny the permit for the additional parking based upon its concern for the welfare of the community, the safety of the citizens, especially with respect to traffic concerns, and the quality of the neighborhood surrounding the Church. Because a rational municipal interest exists to justify the denial of the additional parking SUP, the City's conduct in this respect does not violate the free exercise clause of the First Amendment.

## VII. Constitutionality of RLUIPA

In its Motion for Partial Summary Judgment, the City claims that both RLUIPA and the Texas RFRA are unconstitutional as applied to parking. Given that the Court declines

---

[125] D's Mot. for Summ. J., Ex. 16.

[126] *See generally Shelton*, 780 F.2d at 482.

[127] Plf's Response to D's Mot. for Summ. J., at 47-50.

[128] *See Village of Belle Terre v. Boras*, 416 U.S. 1, 6, 39 L.Ed.2d 797, 94 S.Ct. 1536 (1974) (quoting *Berman v. Parker*, 348 U.S. 26, 33, 99 L.Ed. 27, 75 S.Ct. 98 (1954)).

to exercise subject matter jurisdiction over the state law claims in this instance, the constitutionality of the Texas RFRA is moot. The Intervenor State of Texas' Motion for Summary Judgment is similarly moot. Either, of course, is subject to reiteration if the Plaintiff's Texas RFRA claim is reurged in state court.

RLUIPA is not reached unless a party demonstrates a substantial burden on religious exercise,[129] or religious discrimination or exclusion.[130] In the first instance, RLUIPA § 2(a) is triggered, and in the latter RLUIPA § 2(b). The City has not demonstrated religious discrimination or exclusion on any grounds, and therefore the arguments raised as to RLUIPA § 2(b) are moot. Thus, the only remaining City challenge to RLUIPA is that based upon §2(a), the substantial burden section. Although the Church did prove a substantial burden as to the fourth floor SUP, the City did not challenge RLUIPA's constitutionality on these grounds.[131] However, because the issues are intermingled in supplemental briefing, the Court will in an abundance of caution address the City's argument that RLUIPA is unconstitutional, even though technically the City has not challenged the only ground upon which the Church has proved a substantial burden and thus triggered RLUIPA, the fourth floor SUP.

A. RLUIPA Does Not Violate the Establishment Clause

The City argues that RLUIPA, in attempting to protect religious freedom, runs afoul

---

[129]  42 U.S.C. § 2000cc-(a)(1).

[130]  42 U.S.C. § 2000cc-(b).

[131]  D's Mot. for Part. Summ. J., at 29-32. Although in its response to Intervenor Texas' Motion for Summary Judgment the City refers to both applications, it does so only to the extent that the City views these applications as interrelated. The City has not made a challenge to RLUIPA and Texas RFRA in the context of the fourth floor SUP application. The Church correctly notes that the City expanded the scope of its argument against RLUIPA's constitutionality with each supplemental brief on the issue.

of its sister First Amendment protection, the Establishment clause,[132] by impermissibly advancing religion. While Congress may, and sometimes must, accommodate religion in order to protect religious freedom guarantees,[133] both the Supreme Court and the Fifth Circuit apply the *Lemon* test to evaluate whether a governmental accommodation or recognition of religion violates the Establishment clause.[134] Section 2(a) of RLUIPA violates none of the three prongs of the *Lemon* test.

First, the statute serves a secular legislative purpose because RLUIPA serves to "alleviate significant governmental interference" with religious freedom, a goal which the Supreme Court has recognized as surviving the first prong of *Lemon*.[135] Here, Congress' action codified in RLUIPA effects the "lifting of a regulation that burdens the exercise of religion."[136] Such may properly fall within a secular legislative purpose. The second prong requires that RLUIPA's "principal or primary effect. . . neither advance[] nor inhibit[] religion."[137] The Court finds that RLUIPA's effect in general and in this particular instance is not the advancement of religion, but rather permits religious organizations to advance their own religion by removing governmental obstacles.[138] Finally, the third prong of *Lemon* is

---

[132] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. CONST. amend. I.

[133] *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987).

[134] *Lemon v. Kurtzman*, 403 U.S. 602 (1971); *Flores v. City of Boerne*, 73 F.3d 1352, 1364 (5th Cir. 1996), *rev'd on other grounds*, 521 U.S. 507 (1997).

[135] *Amos*, 483 U.S. at 335; *Boyajian v. Gatzunis*, 212 F.3d 1, 7-8 (1st Cir. 2000), *cert. denied*, 121 S.Ct. 759 (2001).

[136] *Boyajian*, 212 F.3d at 8, *quoting Amos*, 483 U.S. at 338.

[137] *Lemon*, 403 U.S. at 612.

[138] *See Boyajian*, 212 F.3d at 10 (finding that a state law prohibiting municipal authorities from excluding religious uses of property from a zoning area "does not itself advance religion but clears the way so that churches themselves may do so").

met because RLUIPA presents no unacceptable entanglement of government and religion.[139] In *Agostini v. Felton*, the Supreme Court directed that the third prong, entanglement, is more accurately subsumed into the effects analysis of the second prong.[140]  Regardless of the organization of the entanglement factor, it is satisfied here.  RLUIPA requires none of the ongoing supervision by the State of religion, nor interference in religious practice, that characterize entanglement concerns but instead prevents entanglement.[141]  Finally, RLUIPA is neutral in its treatment of religions because it applies equally to all.[142]

## B. RLUIPA is a Valid Exercise of Congressional Powers

The City challenges Congress's power to enact RLUIPA on several grounds.  It claims that RLUIPA exceeds Congress's power under section five of the Fourteenth Amendment, that RLUIPA exceeds Congress's commerce clause power, and that RLUIPA's enactment is inconsistent with separation of powers and traditional notions of federalism.  The Court disagrees on all counts, and joins multiple other courts in so doing.[143]

First, in enacting RLUIPA, Congress did not exceed its section five powers under the Fourteenth Amendment because unlike the broad proscriptions of state action in the statutory predecessor, RFRA, here Congress did not "pervasively prohibit constitutional state action

---

[139]  *See Lemon*, 403 U.S. at 612-13.

[140]  521 U.S. 203, 233 (1997).

[141]  *See In re Young*, 141 F.3d 854, 863 (8th Cir. 1998), *cert. denied*, 525 U.S. 811 (1998) (citing *Amos*, 483 U.S. at 339).  *See also Freedom Baptist Church*, 204 F.Supp.2d at 864-65.

[142]  *See Westchester Day School*, 280 F.Supp.2d at 238.

[143]  *See, e.g. Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003); *Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002); *Westchester Day School*, 280 F.Supp.2d 230; *Murphy v. Zoning Commission of the Town of New Milford*, 289 F.Supp.2d 87 (D. Conn. 2003); *Life Teen, Inc. v. Yavapai County*, 2003 U.S. Dist. LEXIS 24363 (D. Ariz. Mar. 26, 2003).  *But see Elsinore Christian Center v. City of Lake Elsinore*, 291 F.Supp.2d 1083 (C.D. Cal. 2003); *Al Ghashiyah v. Dept. of Corrections of Wisconsin*, 250 F.Supp.2d 1016 (E.D. Wis. 2003)(finding RLUIPA's treatment of prisoner rights to violate the Establishment Clause).

in an effort remedy or to prevent unconstitutional state action."[144] Instead, RLUIPA prohibits unconstitutional state conduct as previously defined in the land use context by the Supreme Court.[145] To whatever extent RLUIPA may address a controversy specifically addressed by prior Supreme Court opinions, "it nevertheless constitutes the kind of congruent and, above all, proportional remedy Congress is empowered to adopt under § 5 of the Fourteenth Amendment."[146]

The City second challenges RLUIPA as ultra vires Congress's powers under the Commerce Clause. Without engaging in a lengthy summary of the Supreme Court's Commerce Clause jurisprudence, the Court finds it sufficient to state its agreement with the Eastern District of Pennsylvania in *Westchester Day School*. The Church's "activities in operating [a religious] school is an economic endeavor within the meaning of the Commerce Clause."[147] This, in addition to RLUIPA's self-contained jurisdictional element,[148] the Court finds sufficient to support a finding that RLUIPA is a permissible exercise of Congress's power under the Commerce Clause.

Finally, the City challenges RLUIPA as violative of traditional notions of separation of powers and federalism. The City argues that separation of powers is endangered by Congress's attempt to reverse the decision in *Smith*. However, this was neither the intent, nor the effect, of RLUIPA, as discussed throughout this opinion. Rather, RLUIPA's § 2(a) codifies existing Supreme Court "individualized assessment" jurisprudence. Moreover, the

---

[144] *City of Boerne v. Flores*, 521 U.S. 507, 533 (1997).

[145] *See* Joint Statement, 146 Cong. Rec. at S7775; H.R. Rep. 106-219, at 17-18.

[146] *Westchester Day School*, 280 F.Supp.2d at 237, quoting *Freedom Baptist Church*, 204 F.Supp.2d at 874.

[147] *Id.* at 238 (citing *U.S. v. Grassie*, 237 F.3d 1199, 1209-10 (10th Cir. 2001); *U.S. v. Ballinger*, 312 F.3d 1264, 1282 (11th Cir. 2002)).

[148] 42 U.S.C. § 2000cc-(a)(2)(B).

extent to which Congress disagreed with the Supreme Court's *Smith* decision, if any, is not the relevant inquiry for separation of powers.[149]  The inquiry must instead focus upon whether or not Congress acted beyond the scope of its constitutional authority, and the Court finds that in the case of RLUIPA, Congress has not done so.  Similarly, as to the City's claim that RLUIPA violates principles of federalism, because the Court finds Congress authorized to enact RLUIPA §2(a)(1) as limited in this case by §§2(a)(2)(B) and 2(a)(2)(C), the statute's validity cannot be challenged by general notions of federalism.[150]  "RLUIPA does not require State or local governments to legislate on behalf of the federal government, or require State officials to administer any federal program. Land use regulation is left to the States and local governments under RLUIPA; they are simply prohibited from imposing substantial burdens on religious exercise in the process."[151]

## VIII.  Conclusion

The Court takes this opportunity to encourage Castle Hills and all other similarly situated communities to engage in thorough and positive debate and negotiation on the issues of zoning of religious organizations and places of worship, recognizing that in the arena of religion, all parties need trod lightly, out of respect for the beliefs of the adherents and out of respect for the importance of religion to our larger American culture.  Cities must govern the health, safety and welfare of their communities, but in so doing, should consider carefully the positive and supportive role that a place of worship will play in doing so.[152]

---

[149]  *See In re Young*, 141 F.3d at 859-60.

[150]  *See United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000).

[151]  *Life Teen*, 2003 U.S. Dist. LEXIS 24363 at *48-49 (citing *Mayweathers*, 314 F3d. 1062, 1069 (9th Cir. 2002)).

[152]  This reality does not rise to the level of exceptional treatment of religion to merit Establishment Clause concerns.

## DISPOSITION

Therefore, it is ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 48) is GRANTED IN PART, DENIED IN PART and DISMISSED WITHOUT PREJUDICE IN PART.

1. Plaintiff's Motion is GRANTED in so far as the City's denial of the fourth floor permit is a substantial burden on religious exercise amidst a system of individualized assessments and is therefore subject to strict scrutiny. The City's denial of the fourth floor SUP was not subject to a compelling governmental interest, and therefore the Church's claims under 42 U.S.C. § 2000cc-(a) and 42 U.S.C. § 1983 for violation of the free exercise clause of the First Amendment are GRANTED.

2. Plaintiff's motion is DENIED as to the claim grounded in the City's denial of the additional parking lot SUP because Plaintiff failed to show a substantial burden.

It is further ORDERED that Defendant's Motions for Summary Judgment (Docket No. 52, 56) are DENIED IN PART and DISMISSED WITHOUT PREJUDICE IN PART.

1. Defendant's Motion is DENIED as to all claims entered in Plaintiff's favor above.

2. Defendant's Motion is GRANTED as to the Church's claims arising under 42 U.S.C. § 2000cc-(a) and 42 U.S.C. § 1983 for violation of the free exercise clause of the First Amendment with respect to the denial of the additional parking lot SUP.

3. In all other respects, Defendant's Motion is DISMISSED WITHOUT PREJUDICE, subject to refiling consistent with this opinion on or before April 22, 2004.

It is further ORDERED that should either party file a dispositive motion on the remaining claims on or before April 22, 2004, then the opposing party shall respond, if at all, within the time permitted by Local Rule. The Court may then, upon the request of either party or on its own, order a hearing to address issues raised.

Because there are no material facts in dispute and therefore trial is unwarranted, it is further ORDERED that should neither party file a dispositive motion on the remaining claims on or before April 22, 2004, then the remaining claims in the above styled and numbered cause shall be dismissed with prejudice and a final judgment in the cause entered.

It is further ORDERED that the Plaintiff's state claims grounded on the Texas Constitution, Texas state law, and Texas RFRA be DISMISSED WITHOUT PREJUDICE, subject to refiling in state court.

It is finally ORDERED that all pending motions are DENIED AS MOOT.

Signed this _17th_ day of March, 2004.


ROYAL FURGESON
UNITED STATES DISTRICT JUDGE